## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHEW KERNISKY, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>  v.<br><br>KAMA DISTRIBUTION, LLC,<br><br>               Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

      Plaintiff Matthew Kernisky ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant KAMA Distribution LLC ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## <u>NATURE OF THE ACTION</u>

      1.     This is a civil class action against Defendant for false, misleading, deceptive, and negligent sales practices regarding its KAMA 7-Hydroxymitragynine ("7-OH") products[1] ("7-OH Products") and 7-Hydroxymitragynine + Pseudo Indoxyl Tablets[2] ("7-OH+ Products," collectively, "the Products").

      2.     7-OH is an alkaloid or psychoactive chemical found in the kratom plant, *mitragyna speciosa*. Mitragynine Pseudoindoxyl is a metabolite of mitragynine, the primary alkaloid found in the kratom plant. The plant originates from Southeast Asia, where its leaves

---

[1] This includes all flavors and doses of Defendant's 7-Hydroxymitragynine tablets and 7-Hydroxymitragynine Liquid Shots.

[2] This includes all flavors and doses of Defendant's 7-Hydroxymitragynine and Pseudoindoxyl tablets.

have long been ingested to produce stimulant and opiate-like effects. Use of kratom in the United States was practically non-existent until the last decade. Since then, kratom has become massively popular because of the stimulant and opiate-like effects produced by its two major alkaloids: 7-OH and mitragynine.

3.     However, what consumers do not know is that the opiate-like effects produced by mitragynine and 7-OH are not the result of novel chemical interactions in the brain. Rather, these alkaloids behave, in part, exactly like opioids. That is, the mitragynine and 7-OH alkaloids found in the kratom plant bind to the same opioid receptors in the human brain as morphine, heroin, and other opioids.[3] Consequently, kratom consumption carries the same risks of addiction, dependency, and painful withdrawal symptoms – among various other negative side effects – as traditional opioids.

4.     But it gets worse. While both active alkaloids in kratom interact with the opioid receptors, 7-OH is substantially more potent than mitragynine. Indeed, some studies have shown that 7-OH is ten times more potent than morphine in activating the mu-opioid receptor, which is the receptor associated most strongly with opioid addiction. Similarly, Pseudoindoxyl is three to five times more potent than morphine in activating the mu-opioid receptor.

5.     7-OH and Pseudoindoxyl do not appear in great quantities in raw kratom. 7-OH makes up less than 0.05% of kratom powder by weight and Pseudoindoxyl is found only in trace amounts. For raw kratom powder consumers, this means that normal doses of kratom powder do not contain enough 7-OH or Pseudoindoxyl to produce the intense narcotic effects and concomitantly strong withdrawals characteristic of traditional opioids. This is not to say that kratom can be consumed with abandon – kratom is highly addictive and will induce opioid

---

[3] An opiate is a substance derived from opium whereas an opioid is any substance that binds with the mu-opioid receptor.

withdrawal symptoms if taken too frequently. Rather, this is to say that in comparison to raw kratom addiction, the withdrawal symptoms from pure 7-OH and Pseudoindoxyl consumption are substantially worse.

6. Defendant does not sell raw kratom. Defendant's 7-OH Products are pure 7-Hydroxymitragynine or Hydroxymitragynine and Pseudoindoxyl. For example, Defendant's 50 mg 7-OH+ Product contians 30 mg 7-Hydroxymitragynine and 20mg Pseudoindoxyl per each tablet. This makes Defendant's Products more addictive than kratom, and the withdrawal symptoms significantly worse.

7. Almost as soon as 7-OH hit the market, the horror stories began to surface. Consumers reported being blindsided by these products, thinking they were just a different form of kratom, and suffering through the worst withdrawal symptoms they had ever experienced – worse than heroin, by some accounts.

8. The general public is largely unaware of kratom and its addictive potential. So, when it comes to "7-Hydroxymitragynine," a derivative of kratom with a torturously complex name, the public is even less aware of it and its negative effects.

9. When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine – they do not think of 7-OH or expect the "kratom alkaloid" product sold at their local gas stations or corner stores to act like an opioid or have the same addiction and dependency risks as opioids. 7-OH is extremely addictive, and as a result, tens of thousands of unsuspecting consumers have developed 7-OH dependencies that have caused them serious physical, psychological, and financial harm.

10. Defendant has intentionally failed to disclose these material facts regarding the dangers of 7-OH consumption anywhere on the Products' labeling, packaging, or marketing

material.  As a result, Defendant has violated warranty law and New York consumer protection laws.

11.     Defendant relies on the Products' vague packaging and consumers' limited knowledge of 7-Hydroxymytragynine to get unsuspecting people addicted to the Products and reap substantial profits from these addictions.  Defendant relies on consumers' ignorance and does almost nothing to correct it.  Such activity is outrageous and contrary to New York law and public policy.

12.     Plaintiff seeks relief in this action on behalf of himself, and as a class action, on behalf of similarly situated purchasers of the Products, for the following violations of: (i) New York's General Business Law ("GBL") § 349; (ii) New York's GBL § 350; (iii) fraud by omission; and (iv) unjust enrichment.

## PARTIES

13.     Plaintiff Matthew Kernisky is a citizen and resident of New York, New York.  He first purchased the Products in or around February 2025, during which time he was a resident of New York.  Plaintiff purchased the Products online and at smoke shops in New York.  Plaintiff did not believe the Products to be harmful and was not aware that the Products carried a potential risk of being addictive.  Plaintiff underwent back surgery and, rather than take prescription medications, he decided to take the Products, which he believed to be a non-addictive herbal supplement.  Plaintiff reviewed the Products' packaging before making his purchase and relied on Defendant's representations in deciding to purchase the Products.  A warning on the Products' packaging would have corrected his belief, but there was none.  Plaintiff began experiencing withdrawals 2–3 months after the first use.  His symptoms included sweating, headaches, abdominal pain and nausea.  This was the moment Plaintiff realized Defendant did not tell the truth about the Products, and that he had become addicted.  Had Plaintiff known that

4

the Products were highly addictive or posed a risk of addiction, by way of a warning on the Products' packaging, he would never have purchased them.

14.    Defendant KAMA Distribution LLC is a Texas limited liability company with its registered located at 5900 Balcones Drive, Ste 100, Austin, TX 78731.  Defendant owns and operates the website www.kamakratom.com/, and advertises, markets, distributes, and sells its Products in New York and throughout the United States.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2), because this case is a class action where the aggregate claims of all members of the proposed Classes (defined below), exclusive of interest and costs, exceed the sum or value of $5,000,000 and at least some members of the proposed Classes, have a different state citizenship from Defendant.

16.    This Court has personal jurisdiction over Defendant because Defendant is an entity with constitutionally sufficient contacts with this District to make personal jurisdiction in this Court proper.

17.    Venue is proper in this District because Defendant sold the Products to consumers in this District, and because Plaintiff was harmed by Defendant's actions in this District.

## FACTUAL ALLEGATIONS

**A.    Background and Pharmacology of Kratom and 7-Hydoxymitragynine**

18.    "Kratom" refers to the substance derived from the leaves of a tropical plant, *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century.  Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium.  Historic

use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

19.    Kratom is the most widely used drug in Thailand.  This popularity does not mean Thailand believes kratom is harmless.  To the contrary, Thailand understands that kratom is dangerous, as demonstrated by its ban of the substance in 1943.[4]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

20.    Kratom's variable effects have historically been part of its appeal.  For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

21.    In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms) and/or to obtain a "legal" or "natural" high.

22.    To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[5]

23.    The chemicals in the kratom plant, which produce a psychoactive effect when ingested, are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic

---

[4] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

[5] When kratom leaves are extracted into a liquid formulation, it is colloquially called a kratom "extract shot."

chemical compounds.  The primary alkaloids in kratom leaves responsible for kratom's effects are mitragynine ("MG") and 7-Hydroxymitragynine ("7-OH").

24.    MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

25.    Defendant's Products are unique as compared to most other kratom products on the market and represent a "next-gen" iteration of the substance in terms of addictiveness and harm-potential.  They are an isolated and concentrated version of kratom, making 7-OH the primary active alkaloid and stripping the rest away.

26.    Compared with raw kratom, 7-OH typically only occurs in doses that are no greater than 2% of total alkaloid content (or 0.05% by weight).  In Defendant's 7-OH Products, however, 7-OH makes up 100% of the total alkaloid content.  Similarly, in raw kratom, Pseudoindoxyl only occurs in trace amounts, but Defendant's 7-OH+ Products are a potent mixture of around 40% Pseudoindoxyl and 60% 7-OH.

27.    7-OH is different than MG because, although both interact with the mu-opioid receptor,[6] MG has a dramatically lower affinity for the mu-opioid receptor, whereas 7-OH has an affinity for the mu-opioid receptor that is comparable to – or greater than – opioids like Percocet, morphine, and oxycontin.  Studies have shown that when 7-OH is administered in concentrated, isolated doses, it presents a significantly greater risk of inducing physical and mental addiction in consumers than raw kratom.  Yet, consumers are largely ignorant of this fact.

---

[6] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia.  For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor that all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

28.     For instance, while both 7-OH and MG target the opioid-receptors, 7-OH's effect on the opioid receptors is approximately forty-six times that of MG, and thirteen times that of morphine.[7]  Similarly, Pseudoindoxyl is three to five times more potent than morphine in activating the mu-opioid receptor.

29.     Thus, kratom is by definition an "opioid," and so is 7-OH.

30.     Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms, which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop but cannot.

31.     All substances that act on the opioid receptors have a high risk of addiction, and 7-OH is no exception.  Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had.  As these doses increase, the body becomes dependent on the drug to feel normal and function properly.  When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs.  Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

32.     Indeed, 7-OH withdrawal symptoms are very similar to those of traditional opioid withdrawal.  These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, stomach pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

---

[7] *Kratom – Pharmacology, Clinical Implications, & Outlook: A Comprehensive Review*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7203303.

33.     Users typically start substances like 7-OH because of how good it makes them feel, but once addicted, they use 7-OH to avoid the pain and sickness of withdrawal.  Use is no longer about getting high, but about not feeling "sick."

**B.      Background and Pharmacology of Kratom and 7-Hydoxymitragynine**

34.     Over the past decade, kratom has exploded in popularity within the United States. As of 2021, the American Kratom Association estimates that kratom is a $1.3 billion a year industry, with 11 million to 15 million annual users within the United States.  Studies show that 1 million United States residents use kratom monthly, and that two-thirds of those users use kratom daily.

35.     Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers, and so it appeals to consumers who falsely equate "natural" with "safe"; second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

36.     7-OH is new to the market, having only arrived at the earliest in 2022.

37.     Kratom is still a relatively unknown substance to the average consumer, and most people have never heard of it.  This is doubly true of 7-OH.  Even if consumers have heard of kratom, they may not have heard of 7-OH.

38.     7-OH sellers advertise it as a substitute for coffee or a kratom derivative of equal potency, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day. Some even assure consumers that 7-OH is a <u>non-addictive</u> way to deal with opioid withdrawal.

These 7-OH companies universally reiterate these purported "benefits" of 7-OH consumption, without disclosing any of its corresponding harms.

39.    As a result of 7-OH manufacturers', retailers', and advertisers' failure to warn consumers of 7-OH's addictive potential, many 7-OH users find themselves blindsided when they stop taking 7-OH and find themselves facing severe withdrawal symptoms from using what they thought was a harmless supplement.  Further, because 7-OH is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid.  Some 7-OH users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

40.    The reports from people addicted to 7-OH are heart-wrenching.  Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to 7-OH, and how difficult it was to stop their 7-OH use.  Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 52,000 members as of August 2025:[8]

> In one post titled **Do no take 7oh**, a user wrote: I'm going to say this loud and clear for everyone in their early stages of quitting, currently, or have already quit. DO NOT take this 7oh shit. It's fucking poison. It's nothing like the extracts and it's a very VERY taxing drug on the body. I have done every single thing under the sun and I can honestly say with confidence that this is by far bar none the absolute worst drug I've ever taken when it comes to detoxing.

> In another post titled **Beware of 7-Hydroxymitragynine,** a user wrote**:** I ended up getting these extract pills that were 14mg of 7 Hydroxymitragynine per pill. Used them for about a week for some bad pain, and then got thrown into aggressive withdrawal. I've been on a now 3 month taper journey off of just a week of using them. It's been hell. Trying to get there slowly tapering. Just wanted to put the PSA out there, something like [7-OH] might be tempting, and it is incredible for pain, but it threw me

---

[8] *See* https://www.reddit.com/r/quittingkratom.

into awful withdrawal that's now forced me to have to taper off of it and take a dose every 12 hours. This was after 2 and a half years of regular Kratom use that never gave me withdrawal. This week of using [7-OH] though mixed with my 2 and a half years of Kratom experience created a withdrawal shitstorm that was never expected. Beware.

> **Another user responded**: I don't know how you're cold turkey from [7-OH], I tried and it was worse than when I had to kick morphine. I've had to do a long and slow taper with 6grams of Kratom powder every 12 hours currently. The [7-OH] withdrawal is very scary, worse than any opiate I've been on.

> **Another User Responded**: I started taking those because the guy suggested them now it's every day for 3 months. I can't stop and get bad withdrawals at 24 hr mark. I'm taking about 6 a day now and I'm spending over 1K per month now it's going to ruin me if I don't stop. I can't believe this is legal, idk what to do

In separate post another user wrote: Guys I desperately need help. I have been taking [7-OH] for maybe 6 months. Like more than three a day. The more research I do on them the more I realize they're not even Kratom and no one scientifically really knows anything about them. I am going across the country tomorrow and am going to be CT for 8 days. I actually really want to stop and I've been trying to for a really long time, but I am terrified of the withdrawals. I don't know what to do. I actually upped my dose this week and have probably been taking more like five a day. I am so embarrassed to say that, I am now realizing that everyone is cautioning even the fucking American Kratom Society about these things. I'm really worried about my mental health not to mention I am going to be with my wife/kids and parents for 8 days. I don't know what I was thinking. Any recommendations?

In another post titled **Could not and would not believe you all…** another user wrote: Long time lurker, first time poster. I went CT three days ago… after using for 1 1/2 years. The last 3 months I've been exclusively abusing the [7-OH] tablets, a full pack of three a day. I told myself you were all exaggerating.  I told myself you were all weak.  Now I'm completely humbled and fully ashamed.  The last three days I've experienced a fatigue and fever like I've never experienced before. Trying to fall asleep and stay asleep, is absolutely impossible. During the night I sweat through my sheets…during the day I feel like a walking corpse.  And I caved.  I took half a tablet today just to stop the WD symptoms I was feeling. Now my brain just wants to rationalize what I've done. But I know, deep down this was the wrong move…I'm truly ashamed.  I share this post for the people like me, who are lurking or glancing at this subreddit from time to time and telling themselves "naw I'll be fine…I can handle the WD whenever I decide or if I ever stop."  I share this post for future me to look at to read and see the seriousness of my addiction and situation. I know that next time

I quit I need to be more prepared. If you abuse it the way I do…Kratom is robbing you of life, and you trade it willingly for a 2 hour high. There's so much more to life than getting high. Thank you to this community, I hope you all know how much reading your stories and struggles does for someone like me. Thank you 🙏🏼

41.     Other experiences with kratom (not necessarily 7-OH products) described on the

subreddit are similarly disturbing:

**One user wrote:** I started using kratom in pill and powder form a couple years ago. I had no idea it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

**Another user shared:** I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

**Another user shared:** I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly… Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all

day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

42.     This Internet forum is filled with other accounts like these, and the stories are consistently the same: well-meaning people were looking to feel better by taking what they thought was an "herbal supplement," only to develop an opioid-like addiction.  This anecdotal evidence makes clear that 7-OH's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions.  However, Defendant's Products have no information whatsoever warning that 7-OH is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.

43.     Consumers who knew the truth about 7-OH would not have purchased the Products.

**C.    Defendant Knew or Should Have Known It Was Selling a Highly Addictive Drug to Unsuspecting Consumers, and Failed in Its Duty to Warn Consumers**

44.     Defendant's marketing is directed toward making the product look innocent while obfuscating its true addictive qualities.  Indeed, the packaging of Defendant's 7-OH Shots looks more like an energy drink than a dangerously strong opioid.  *See* Figure below.  On the left is an over the counter 5-hour energy shot and on the right is Defendant's 7-OH Shot Product.  The design shape is almost identical.

 

*Figure 1 – Comparison of a 5-hour Energy Shot and Defendant's 7-OH Shot*

45.      It gets worse.  Defendant's tablet Products, in particular Defendant's blue 7-OH and 7-OH+ Products, are an overt nod to counterfeit oxycodone tablets.  These tablets are known as "M30's," "pressies," or "blues."  Comparison images between street oxycodone and Defendant's blue Tablets are reproduced below.  On the left is a photograph of illegal oxycodone ("blues").  On the right is Defendant's Product.  The shade of blue is nearly identical, and Defendant even scores the pills.  This is outrageous, a moral and ethical failure, and in contravention of public policy.




*Figure 2 – Comparison Between Street Oxycodone and Defendant's 7-OH Tablets*




*Figure 3 - Comparison Between Street Oxycodone and Defendant's 7-OH+ Tablets*

46.     Defendant's glossy website and design language also distract from the truth: that it is selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the products.  Nowhere on the front of the packaging for the Products (*See* Figures 1–3) nor on the Website does Defendant disclose the dangers of the product.

47.     Instead, the Defendant touts the "benefits" of 7-OH on their Website in flashy and dramatic language.  For instance, in the image below, taken from Defendant's Website, Defendant tells customers that 7-OH has "exceptional analgesic prowess" and "soothing sedative qualifies" "celebrated for its ability to deliver much-needed pain relief and deep relaxation."  *See* Figure 4.



### What is 7-Hydroxymitragynine?

Get ready to dive into the fascinating world of 7-Hydroxymitragynine (7OH)! This powerful alkaloid is a standout component of the Mitragyna speciosa tree, also known as kratom. Renowned for its potent effects, 7OH is the driving force behind many of kratom's remarkable properties. From its exceptional analgesic prowess to its soothing sedative qualities, 7OH is celebrated for its ability to deliver much-needed pain relief and deep relaxation.

*Figure 4*

48.     In its Product descriptions on the Website, Defendant uses vague terms to describe the "effects" that its Products have on users:

> "Specifically formulated for seasoned users, each 30ml bottle contains a potent 45MG 7-Hydroxymitragynine, delivering enhanced effects that are sure to impress.[9]

---

[9] https://kamakratom.com/product/kratom-extract-7-hydroxymitragynine-shot/

"Experience a smooth onset of effects that can help take your experience to the next level … Discover the power of nature with KAMA – your journey to enhanced well-being starts here."[10]

"Each tablet contains 20mg of premium kratom extract, ensuring an effective dosage that enhances focus, boosts energy, and promotes relaxation … Choose KAMA to seamlessly integrate into your wellness routine!"[11]

49.    While some customers who have experience with Defendant's products may have a sense of what these "effects" or "experiences" may be, regular consumers do not.  Reasonable consumers, looking at the Products' packaging and online store description, would not presume that 7-OH is highly addictive.  They would receive no warning whatsoever that the product they purchased was a powerful opioid.

50.    The back of the packaging does little better than the front to provide consumers with an adequate warning of the Products' addictive qualities.  *See* Figure 5.



***Figure 5***

―――――――――――――――

[10] *Id.*

[11] https://kamakratom.com/product/kratom-extract-7-hydroxymitragynine-cherry-tablet-80mg/

51.     Defendant's boilerplate disclaimer does not specify how or why the Products might be dangerous.  Defendant's Products have no information whatsoever warning that 7-OH is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.  It also only notes that "ingesting Mitragyna Speciosa can be dangerous," but the product Defendant sells is 7-hydroxymitragynine.  Consumers reading this warning likely have no knowledge about the scientific name of the kratom plant or kratom alkaloids.  By referring to "mitragyna speciosa" Defendant only informs consumers that consuming a *plant,* not a specific extracted alkaloid can be "dangerous."  Moreover, Defendant's disclaimer is in extremely small font, and there is nothing tying the text to the front of the label that would encourage consumers to turn over the Product and read the back – like an asterisk, for example.  Consumers picking up the product cannot easily discern what the disclaimer means nor understand that the Products are likely to form an opioid-like addiction.

52.     Defendant is aware that its Products are highly addictive.  Defendant manufactures the Products in a highly specialized lab, and utilizes highly technical knowledge about kratom and its alkaloids to synthesize the Products.  The very fact that Defendant possesses the capability to manufacture the Products shows that it understands the pharmacokinetic nature of 7-OH and the substantial risk of addiction that it poses to consumers.

53.     This fact is not up for debate.  The pharmacological effects of 7-OH have been studied, and it is well-established that 7-OH acts on the same mu-opioid receptors in the brain as traditional opioids do.  Further, there are widespread reports and studies of other addiction and dependency issues.

54.     Yet, despite being acutely aware of the addiction risks posed by the Products, Defendant fails to disclose 7-OH's addictive potential to customers on the Products' packaging.

55.     Defendant is in a position of superior knowledge to the average reasonable consumer, who likely knows nothing about 7-OH, and yet fails to do so.

56.     Addiction is a disease.  As such, Defendant's Products pose an unreasonable health hazard, and Defendant has a duty to disclose this fact ***on the Products' packaging.***

57.     Defendant, through its misleading advertising and failure to disclose 7-OH's addictive properties on the Products' labels, relied upon the average consumer's incomplete knowledge of 7-OH to better sell the Products and get users addicted to them.

58.     Defendant fails to disclose 7-OH's addictive potential because Defendant knows that it is a material fact to reasonable consumers that would influence their purchasing and consumption decisions, likely to Defendant's financial detriment.

59.     By any metric, Defendant's conduct is immoral, unethical, and contrary to New York public policy.

60.     The United States is currently experiencing an opiate crisis that is shaking the foundations of our society.  Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosure of the Products' risks through the use of false and misleading packaging and marketing.  That cannot—and should not—stand, at least when Defendant's conduct entails violations of state consumer protection statutes as it does here.

61.     Accordingly, because the facts concern a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and the members of the Classes the true standard, quality, and grade of the Products and to disclose the Products are—or potentially are—addictive.  Defendant also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature and composition of the Products as the owner, manufacturer, producer, marketer, and seller of the Products.  Nonetheless, Defendant concealed this material information.

## CLASS ALLEGATIONS

62.    Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal

Rules of Civil Procedure on behalf of himself and all other Class members, defined as follows:

> All persons nationwide who, within the applicable statute of
> limitations period, purchased Defendant's 7-hydroxymitragynine
> products or 7-hydroxymitragynine + pseudoindoxyl products (the
> "Nationwide Class").

> All persons who, within the applicable statute of limitations period,
> purchased Defendant's 7-hydroxymitragynine products or 7-
> hydroxymitragynine + pseudo indoxyl products while in New
> York (the "New York Subclass").

63.    Excluded from the Classes are Defendant, as well as its officers, employees,

agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers,

employees, agents or affiliates, and any judge who presides over this action.  Plaintiff reserves

the right to expand, limit, modify, or amend these Class definitions, including the addition of one

or more subclasses, in connection with their motion for Class certification, or at any other time,

based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

64.    ***Numerosity***: The members of the Classes are so numerous that joinder of all

members is impracticable.  Plaintiff is informed and believes that the proposed Classes contain at

least thousands of consumers throughout New York and the United States who have been

damaged by Defendant's conduct as alleged herein.  The precise number of members of the

Classes is unknown to Plaintiff at this time.

65.    ***Existence and Predominance of Common Questions of Law and Fact***:  This

action involves common questions of law and fact, which predominate over any questions

affecting individual members of the Classes.  These common legal and factual questions include,

but are not limited to, the following:

a.  whether the labels on Defendant's Products have the capacity to
mislead reasonable consumers;

b.  whether Defendant knew that 7-OH is a highly addictive substance
that causes physical and psychological dependence and opioid-like
withdrawal symptoms;

c.  whether Defendant had a duty to disclose that 7-OH is addictive on
the Products' packaging;

d.  whether Defendant's conduct alleged herein constitutes unjust
enrichment;

e.  whether Defendant's conduct constitutes a fraudulent omission;

f.  whether Plaintiff and the Classes are entitled to damages and/or
restitution; and

g.  whether an injunction is necessary to prevent Defendant from
continuing to sell the Products without warning labels of their
addictiveness or risk thereof.

66.    *Typicality*: Plaintiff's claims are typical of the claims of the Classes in that

Plaintiff and the Class members sustained damages as a result of Defendant's uniform wrongful

conduct, based upon Defendant's failure to inform Plaintiff and all others similarly situated that

the Products are highly addictive, or pose a risk thereof, and are akin to opioids.

67.    *Adequacy*: Plaintiff will fairly and adequately protect the interests of the members

of the Classes.  Plaintiff has retained counsel experienced in complex consumer class action

litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no antagonistic

or adverse interests to those of the Classes.

68.    *Superiority*: A class action is superior to all other available methods for the fair

and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions

of individual actions are economically impractical for members of the Classes; the Classes are

readily definable; prosecution as a class action avoids repetitious litigation and duplicative

litigation costs, conserves judicial resources, and ensures uniformity of decisions; and

prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

69.     Defendant has acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

70.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff, members of the Classes, and the general public – who are also negatively impacted by the dregs of addiction – and will likely retain the benefits of its wrongdoing.

71.     Based on the forgoing allegations, Plaintiff's claims for relief include those set forth below.

<u>**COUNT I**</u>
**Violation of New York's General Business Law § 349 ("GBL")**

72.     Plaintiff realleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

73.     Plaintiff brings this claim individually and on behalf of the members of the New York Subclass against Defendant.

74.     This claim is brought pursuant to the laws of the State of New York.

75.     New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce[.]"  Defendant's conduct, as set forth herein, constitutes deceptive acts or practices under this section.

76.     Plaintiff and members of the New York Subclass are "persons" under the GBL § 349(h), and Defendant's actions as set forth herein occurred in the conduct of "business, trade or commerce" under the GBL.

77.     In the course of its business, Defendant marketed its 7-OH Products in such a way that gave consumers, including Plaintiff and members of the proposed New York Subclass, the impression that its Products were safe to consume and did not cause any opioid-like addiction and withdrawal symptoms; therefore, leading to the false impression that Defendant's Products

were worth more than they actually were.  In truth, the Products, as currently labeled and packaged, are worthless because of the unreasonable risk of addiction they pose.

78.    In all meaningful respects, Defendant's deceptive acts and practices were directed at consumers.

79.    Plaintiff and members of the proposed New York Subclass had no way of discerning the true addictive and harmful properties of Defendant's Products as a result of Defendant's materially misleading failure to disclose such risk.  Information as to the potential addiction risks of their Products was in Defendant's exclusive control.  Plaintiff could not possibly have known that the Products at issue would pose a serious risk of addiction because such information was not reasonably available to the public.

80.    In other words, Defendant's deceptive acts and practices are materially misleading because they violate consumers' reasonable expectations that the Products would be appropriately packaged and labeled to the extent that they posed such an unreasonable safety hazard – i.e., serious risk of addiction and physical dependence.  Instead, Defendant's statements, or lack thereof, on its Products' packaging and labels, when considered from the perspective of a reasonable consumer, give the false impression that Defendant's 7-OH Products are generally safe to consume and do not cause opioid-like effects and withdrawal symptoms.  A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the Product.

81.    Defendant knows that health information about the Products is material to consumers.  As a result of its deceptive acts and practices, Defendant sold tens, if not hundreds, of thousands of 7-OH Products to unsuspecting consumers across New York.  Defendant knew consumers would purchase its Products and/or pay more for them under the false – but

reasonable – belief that they were safe to consume regularly and did not pose a serious risk of addiction.

82.    Plaintiff and members of the proposed New York Subclass reasonably relied upon Defendant's misrepresentations and omissions when purchasing Defendant's 7-OH Products. Plaintiff and members of the proposed New York Subclass would not have purchased Defendant's Products but for Defendant's failure to disclose 7-OH's composition, addictive nature, and the negative side effects and withdrawal symptoms that would result from the use of Defendant's Products.

83.    Defendant knew or should have known that this conduct violated the GBL and Defendant owed a duty to Plaintiff and members of the proposed New York Subclass to refrain from engaging in such deceptive acts or practices, and to disclose the truth about the real risks from 7-OH, especially in its concentrated, or "extract," form.

84.    If Defendant had advertised its Products truthfully and in a non-misleading fashion, Plaintiff and other New York Subclass Members would not have purchased them.

85.    Defendant's violations of the GBL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that members of the proposed New York Subclass and the general public will be deceived into purchasing Products based on Defendant's misrepresentations and omissions regarding the purported "benefits" and actual harms posed by its 7-OH Products.  These misrepresentations and/or omissions cause financial damage to consumers, who would not have bought Defendant's Products had they known about their true addictive nature.

86.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiff and members of the proposed New York Subclass

suffered ascertainable loss and actual damages in that they would not have purchased the

Products but for Defendant's misrepresentations and omissions concerning the addictive

properties of its 7-OH Products.

87.    Plaintiff and members of the proposed New York Subclass are entitled to all of

the damages, remedies, fees, and costs available under the GBL, including but not limited to,

recovery of actual damages and/or fifty dollars in statutory damages per violation (i.e., per unit

sold), whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other

remedies this Court deems proper.

## COUNT II
### Violation of New York's GBL § 350

88.    Plaintiff realleges and incorporates by reference every allegation set forth in the

preceding paragraphs as though alleged in this Count.

89.    Plaintiff brings this claim individually and on behalf of the members of the New

York Subclass against Defendant.

90.    This claim is brought pursuant to the laws of the State of New York.

91.    New York GBL § 350 makes unlawful "[f]alse advertising in the conduct of any

business, trade or commerce."  False advertising includes "advertising, including labeling of a

commodity . . . if such advertising is misleading in a material respect," taking into account "the

extent to which the advertising fails to reveal facts material in light of such representations

[made] with respect to the commodity …"  N.Y. GBL § 350(a).

92.    Defendant's packaging, labeling and advertisement of the Products are materially

misleading insofar as they fail to disclose or reveal the existence of the serious potential for

addiction and/or opioid-like dependence.  By misrepresenting the true contents of the Products,

Defendant's marketing and labeling misleads a reasonable consumer.

93.     Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

94.     Defendant had exclusive knowledge of the addictive nature of its Products.

95.     Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of the Products they purchase and the nature of the ingredients therein, including the risk that the consumption of such Products will result in addiction and/or physical or psychological dependence.

96.     Defendant's materially misleading practices were likely to, and did, deceive reasonable consumers, including Plaintiff and members of the New York Subclass, about the real harmful nature of its 7-OH Products.  Plaintiff and members of the proposed New York Subclass reasonably relied upon Defendant's material omissions when purchasing Defendant's Products.

97.     Plaintiff and members of the proposed New York Subclass would not have purchased Defendant's Products but for Defendant's misrepresentations and omissions regarding the true nature of 7-OH and the effects of the ingredients in its 7-OH Products.  In other words, Plaintiff and members of the New York Subclass would not have purchased the Products had they known that the Products posed such a serious risk for addiction.

98.     Defendant's violations of the GBL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that members of the proposed New York Subclass and the public will be deceived into purchasing Products based on Defendant's misrepresentations and/or material omissions regarding the harmful and addictive nature of its Products.  These misrepresentations and/or omissions by Defendant lead to financial damage for consumers like Plaintiff and members of the proposed New York Subclass.

99.     Plaintiff and members of the proposed New York Subclass are entitled to all the damages, remedies, fees, and costs available under the GBL, including, but not limited to, recovery of actual damages and/or $500 per violation (i.e., per unit sold), whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## COUNT III
## Fraud by Omission

100.    Plaintiff realleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

101.    Plaintiff brings this claim individually and on behalf of the Classes.

102.    Defendant misrepresented that its Products have attributes or qualities that they do not have by failing to disclose that 7-OH is addictive and can cause opioid-like withdrawal.

103.    Defendant knows that 7-OH is addictive because it interacts with 7-OH vendors and has been made aware of user reports.  It is also in Defendant's financial interest to know how addictive its Products are so that it can more reliably make revenue projections and otherwise predict cash flow.

104.    Defendant also knows that knowledge of 7-OH's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

105.    The average reasonable consumer in the 7-OH purchasing context does not know that 7-OH is addictive and cannot reasonably access that information.

106.    Defendant therefore had a duty to Plaintiff and the members of the Class to disclose on its Products' packaging that 7-OH is addictive and can cause withdrawals.

107.    Consumers, including Plaintiff, reasonably and justifiably relied on Defendant's omission because it is reasonable to assume that a product which is addictive like a street or pharmaceutical opioid would bear a warning.

108.     As a result of Defendant's material omission, Plaintiff and the Class members paid for 7-OH Products they would not have purchased had they known the truth about the Products.

## COUNT IV
### Unjust Enrichment

109.     Plaintiff realleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

110.     Plaintiff brings this claim individually and on behalf of the Classes.

111.     Plaintiff and the members of the Classes conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

112.     Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the members of the Classes.

113.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Products were addictive and similar to opioids.  This caused injuries to Plaintiff and members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

114.     Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiff and the members of the Classes.

115.     Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

116.     Plaintiff and the members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

117.    As a direct and proximate result of Defendant's actions, Plaintiff and the members of the Classes have suffered in an amount to be proven at trial.

118.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which they entitled.

119.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself, and on behalf of the Class, respectfully request this Court award relief against Defendant as follows:

a.    an order certifying the Class and designating Plaintiff as the Class Representative and his counsel as Class Counsel;

b.    award Plaintiff and members of the Class actual, consequential, punitive, and statutory damages, as appropriate;

c.    award declaratory relief as permitted by law or equity, including directing Defendant to identify, with Court supervision, victims of their misconduct and pay them all money they are required to pay;

d.    award attorneys' fees and costs; and

e.    award any other further relief as the Court may deem necessary or appropriate.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury on all claims so triable.

Dated: September 19, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Neal J. Deckant*
          Neal J. Deckant

Neal J. Deckant
Bursor & Fisher, P.A.
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com

*Attorney for Plaintiff*